Billy V. and Betty L. Wann v. Commissioner.
Wann v. Commissioner
Docket No 2301-66.
United States Tax Court
T.C. Memo 1968-246; 1968 Tax Ct. Memo LEXIS 52; 27 T.C.M. (CCH) 1301; T.C.M. (RIA) 68246; October 28, 1968. Filed *52 In 1959 petitioners rented a 25-acre farm with a residence and barn located on it and moved there to live. They continued regular, full-time employment at places away from their residence. In 1962, 1963, and 1964, petitioners sold livestock for gross sales proceeds of $214.95, $274 and $258.60, respectively, against which they claimed operating business expense deductions of $2,869.51, $6,837.45 and $6,667.21, respectively, with resulting farm losses. A substantial portion of the alleged farm business expense was the estimated cost of commuting from the farm residence to petitioners' respective places of employment and alleged salaries to petitioners' children. The petitioners' gross income from wages for the years 1962, 1963, and 1964, was $12,499.88, $13,897.27, and $13,505.26, respectively. Held: Petitioners' livestock raising endeavors did not constitute a trade or business or a venture for the production of income; the respondent's disallowance of the losses claimed for the years in question is sustained. Held, further: Assets purchased were not used in a trade or business or for the production of income, and therefore petitioners are not entitled to investment credits for the *53 taxable years 1963 and 1964. Held, further: Petitioners failed to prove the total amount of support or the amount they contributed toward a claimed dependent's support; petitioners are not entitled to a dependency deduction for this alleged dependent for the taxable year 1962. Betty L. Wann and Billy V. Wann, pro se, Box 17, Hopland, Calif. Sheldon M. Sisson, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: Respondent determined the following income tax deficiencies against petitioners: Taxable Year
Deficiency
1962
$ 712.60
1963
1,667.48
1964
1,349.87
The primary issue for decision is whether or not the petitioners' farming activities constituted a trade or business or, alternatively, a venture entered into for the production of income. If it is held that the petitioners were so engaged, we must then determine whether certain alleged expenses, some of which have been conceded by respondent, were ordinary and necessary as to the conduct of a farming business or for the production of income. The resolution of the primary issue governs the disposition of an ancillary issue of whether the petitioners are entitled to claim investment credits for certain expenditures *54 during two of the years in question. A secondary issue for decision is whether the petitioners are entitled to claim Loda Dawson, Billy Wann's mother, as a dependent for the taxable year 1962. Respondent has conceded a minor issue as to the basis of certain assets sold in 1964. Findings of Fact Some of the facts and exhibits have been stipulated and are adopted as our findings and incorporated herein by this reference. Petitioners are husband and wife, and, at the time of filing their petition herein resided at Hopland, California. They filed joint Federal income tax returns for the calendar years 1962, 1963, and 1964 with the district director of internal revenue, San Francisco, California. In December 1959, petitioner rented a 25-acre parcel of rural land with a delapidated house located on it. The property, which was rented from an unrelated person, is located on U.S. Highway 101 just south of the bridge over the Russian River, and a few miles south of Hopland, California. 1302 The annual rent for the property, $600, was paid for each of the years in question. The property consists of two long strips of land along both sides of U.S. Highway 101; it is approximately a half mile *55 long and 200 yards wide on each side of the highway. Going north toward Hopland, the land on the left side of the highway had alfalfa growing on it; the right side, which is very hilly, was used as pasture land. The Russian River flows along the left side of the property which is below the level of the roadbed. All of the structures are at the northern end of the parcel on a leveled area on the right side of the highway. The residence is constructed of wood and contains three bedrooms, a kitchen, living room, and a bathroom. In order to make it more livable, the petitioners made substantial repairs to the roof and other parts of the house in 1959 before moving in. Also located on the property were a garage, a small barn, approximately 30 by 40 feet, a chicken house, and a storage shed. In 1962, 1963, and 1964, Betty Wann was employed by the State of California at Mendocino State Hospital at Talmage, California, as a psychiatric technician. The distance from the petitioners' house to the hospital is approximately 18 miles. Betty started working at the hospital in 1956. Prior to that she had worked as a waitress for a short period of time. Her working hours in 1962, 1963, and 1964, began *56 at 6:30 a.m. and concluded at 3 p.m. She did not arrive home before 3:30 and if there were any errands, she might return as late as 5 p.m. She regularly worked five days each week. In 1962, 1963, and 1964, Billy Wann was employed by Lindroth Timber Products at Cloverdale, California, as a panel patcher and as a sheet turner with the spreader crew. The distance from the house to Lindroth Timber Products is approximately 14 miles each way. Billy normally worked at Lindroth Timber Products six days a week. He normally began work at 5 a.m. and worked many hours each day. He usually returned home between 5 p.m. and 8 p.m., but on some days he reached home earlier. Billy had been employed by various lumber companies, such as Lindroth Timber Products, from 1951 through 1966. In 1966 he was employed as a general laborer by the Italian Swiss Colony Wine Company. In 1962, 1963, and 1964, Billy and Betty had an automobile and a pick-up truck. Betty usually drove the automobile to the hospital at Talmage and Billy usually drove the pick-up truck to Lindroth Timber Products. At some undisclosed time between December of 1959 and the year 1962, Billy acquired some cattle. Thereafter he raised some *57 beef cattle at his farm near Hopland and he also went into a cattle-raising venture with his brother at Willits, California, where they had a rent-free lease of property. He also bought and sold cattle. In 1962, the petitioners made the following livestock sales of cattle raised: 1 Whiteface cross heifer
$104.00
1 Whiteface heifer
69.39
1 Bull with whiteface
86.90
1 Heifer, black
50.40
1 Angus heifer
44.20
1 White horse 75.00
Total
$429.89 Billy and Betty Wann reported one-half of the sales proceeds, $214.95, as did Billy's brother, as each had a one-half interest in the animals. Some of these animals had been raised at Willits, California, on the rent-free property leased by petitioners and Billy's brother. In 1963, the petitioners made the following livestock sales: 1 Whiteface calf
$ 69.00
1 Holstein calf
56.00
1 Guernsey cow
150.00
1 Angus heifer calf
58.00
1 Black Whiteface bull calf
58.00
1 Holstein steer
130.00
1 Black Whiteface bull calf
65.00
Total
$586.10
Of this total for 1963, $158 was from sale of cattle raised and $428.10 from sale of cattle purchased at a cost of $312. Gross profit from all sales of cattle was $274. In 1964, the petitioners made the following livestock sales: 1 Red Whiteface heifer calf
$ 66.00
1 Whiteface Jersey calf-heifer
70.00
1 Angus steer 122.60
Total
$258.60
In *58 the same year the petitioners received $80 from an unrelated party for mowing and baling eight tons of hay. They reported this as farm income from machine work. In their 1962 return, petitioners deducted $1,246 as a mileage expense attributable to the trade or business of farming. The petitioners estimated that they had driven 23,076 miles in 1962 and, of this amount, 12,460 miles, at ten cents per mile, was estimated 1303 and treated by the petitioners as businessrelated mileage. In 1963 and 1964, petitioners paid $1,072.56 and $962.24 for gasoline, respectively. Each of these amounts were deducted on their 1963 and 1964 returns as a business expense. A substantial part of the mileage and gasoline expense deducted in 1962, 1963, and 1964, related to the travel between the petitioners' residence and their places of employment. The remainder of the mileage pertained to the various trips to town which Betty Wann made to pick up groceries and supplies and the transportation by Betty of Loda Dawson, Billy's mother, between her home in Hopland and petitioners' residence. The record does not reflect if any additional gasoline expense was incurred in 1963 and 1964 for personal use of petitioners' *59 vehicles. In 1962, the petitioners did not report the payment of any salaries. In 1963, payments for "labor hired" were reported and an expense deduction claimed therefor in petitioners' farm expense schedule in the total amount of $2,516. These amounts were allegedly paid as follows: $ 598
Billy Wann, age 11
598
Jack Wann, age 10
1,300
Loda Dawson
$2,496
20
Paid to unrelated person for hauling cows
$2,516
In 1964, "labor hired" payments of $2,600.90 were reported and claimed as part of the farm expense. They were allegedly paid as follows: $ 598.00
Billy Wann (age 12)
598.00
Jack Wann (age 11)
1,300.00
Loda Dawson
$2,496.00
104.90
Paid to unrelated person for digging fences
104.90
Paid to unrelated person for digging fences
$2,600.90
Loda Dawson aided the petitioners for a number of years, including the years in question, by staying with her grandchildren while their parents were at work. During the years in issue, Loda would arrive at the petitioners' home at 6 a.m. each morning. Betty drove to Hopland to pick her up, then drove her back to the farm to stay for the day before Betty left for work. Loda awoke the children and got them ready for school. In addition, she cleaned house, mopped floors, washed, *60 ironed, and performed other miscellaneous household tasks. On some occasions when the Wanns did not arrive home in the evening, Loda supervised the children in the feeding of the livestock and other chores. In 1963, petitioners began to pay Loda $108 a month for her services; the amounts deducted as salary to her are set forth above and represent the total paid in 1963 and 1964. In the years 1962 through 1964, the two older boys Billy and Jack and the two other Wann children attended school five days a week. Their hours were from 9 a.m. to 3:30 p.m. and they went back and forth to school by bus leaving home before 8 a.m. and getting home at approximately 4 p.m. The two older boys helped around the house with the household duties, and also with the outdoor chores. In 1963, petitioners claimed the deductions mentioned for salaries allegedly paid to their two sons. The boys, however, were not paid on a regular basis and petitioners did not maintain any payroll records. The salary claimed for each boy, $598, was estimated and chosen by petitioners as an arbitrary sum so as to eliminate the necessity of having the boys file an income tax return. Both boys performed such chores as the feeding *61 of the livestock, helping with the building of fences, cutting grass, picking up their clothes, and making their beds. They were not given any other funds or allowances except the alleged salary payments and used whatever was paid to them for spending money, clothing and other personal needs. The amount actually given them is not established by any evidence of record. The petitioners made no purchases of animals in 1962. The following livestock purchases were made in 1963: 1 Whiteface Jersey calf heifer
$ 50
1 Guernsey heifer calf
50
1 Holstein steer
50
1 Black Whiteface bull calf
45
1 Black Whiteface sow
225
1 Angus bull calf
0
1 Guernsey cow
155
1 Angus heifer calf
0
1 Whiteface cow
155
1 Holstein bull calf
20
1 Whiteface heifer calf
17
1 Holstein bull calf
20
1 Black Whiteface bull calf
25
1 Red Whiteface calf heifer 0
$812
In 1964, the following purchases were made: 1 Charlet
0
1 Black Whiteface
$ 15
1 Guernsey cow
180
1 Red Whiteface heifer calf 0
$195 1304 The Wanns did not own a bull during the years at issue. As of September 25, 1967, the date of trial, the Wanns no longer owned any livestock. Their highest inventory of livestock had been approximately 16 head at an undisclosed time. The petitioners reported *62 farm losses of $2,654.56, $6,563.45, $6,328.61, in the years 1962, 1963, and 1964, respectively. Following is a schedule of their farm income and expenses as reported for each year: 1962
1963
1964
Income:
Cattle raised
$ 214.95
$ 158.00
$ 258.60
Cattle purchased (less basis)
0
116.00
0
Machine work 0
0
80.00
Total Income
$ 214.95
$ 274.00
$ 338.60
Expenses:
Labor hired
0
$2,516.00
$2,600.90
Repairs, maintenance
$ 115.79
181.29
761.12
Interest
133.37
112.78
32.08
Feed & Seed
131.33
278.33
171.56
Machine hire
0
0
12.50
Supplies
0
520.00
52.00
Breeding fees
0
0
15.00
Veterinary
0
61.11
3.95
Gasoline
0
1,072.56
962.24
Taxes
84.00
122.72
215.51
Insurance
125.12
190.08
311.27
Utilities
135.00
198.73
237.06
Rent
600.00
600.00
600.00
Damages
37.50
0
0
Commission on sale
9.70
0
0
Brand fee
3.00
3.00
0
Accounting
20.00
25.00
0
Mileage
1,246.00
0
0
Depreciation 128.70
955.85
692.02
Total Expenses
[1] $2,869.51
$6,837.45
$6,667.21
Loss ($2,654.56)
($6,563.45)
($6,328.61)
The petitioners' gross income from wages for the years 1962, 1963, and 1964, was $12,499.88, $13,897.27 and $13,505.26, respectively. On their 1963 return petitioners claimed an investment credit of $250.28 for the purchase of a $2,600.40 pick-up *63 truck purchased that year for $2,600 and a tractor costing $975. On their 1964 return petitioners claimed an investment credit of $22.02 for the purchase of a $175 tractor attachment (disc) and a self-priming water irrigating pump costing $139.50. They paid $175 for the disc and $139.50 for the pump in 1964. In 1964, the tractor and its attachment were sold by the petitioners as was a bailer and rake. Petitioners' cost basis in the bailer and rake was $185 and in the tractor and disc $1,150 as reported in Schedule D on their 1964 return. Loda Dawson lives in Hopland, California. The house she lives in there is owned by her and was built in 1957 or 1958 by Billy Wann and his brother. It has four rooms and a bath. Its fair rental value in 1962 was $50 per month. She began receiving social security benefits in about 1962 or 1963. Loda filed a return in 1963 showing that she was over 65 years of age. In their 1962 return, petitioners claimed Loda Dawson as a dependent. Some of the items claimed as farm expenses on petitioners' returns were estimates made by petitioners and others were not substantiated or established at trial. No books, records, receipts or other documentary evidence was *64 produced. The parties have stipulated as follows with respect to various items of alleged farm expense claimed: Petitioners paid $84 in 1962; $122.72 in 1963; and $215.51 in 1964 for personal property taxes and automobile licenses. Petitioners paid a total of $125.12 in 1962; $190.08 in 1963; and $311.27 in 1964 for automobile and personal liability insurance. Petitioners paid $135 in 1962; $198.73 in 1963; and $237.06 in 1964 for a portion of their electric and telephone bills. 1305 In 1963, petitioners paid $61.11 for breeding fees and medicine for the animals. In 1964, the amounts paid were $15 (breeding fees) and $3.95 (medicine for the animals). In 1962, petitioners paid $37.50 for the death of three sheep which a neighbor claimed had been killed by the Wanns' dog. This was claimed as "Damages" on the return for 1962. In 1962, petitioners paid $9.70 as a commission to the auction yard where they sold some animals. In 1962 and 1963, petitioners paid $3 (in each year) to the State of California as a brand registration fee. Petitioners paid $20 in 1962 and $25 in 1963 for accounting services. Petitioners estimated $10 a week times 52 weeks in 1963 for supplies, including tires, *65 bailing wire, (total $520). In 1964, the estimate for supplies was $1 per week times 52 weeks. Petitioners paid $115.79 in 1962; $181.29 in 1963; and $761.12 in 1964 for repairs and maintenance. In 1964, the amount includes materials for a fence along the river bottom. During the Christmas week flood of 1964 the fence was damaged. Petitioners paid $133.37 in 1962; $112.78 in 1963; and $32.08 in 1964 in interest to the California State Employees' Credit Union. The money was used in 1960 or 1961 to buy Angora goats which had been kept at Willits, California. Petitioners paid $131.33 in 1962; $278.33 in 1963; and $171.56 in 1964 for feed and seed for the animals. In 1962, some of the feed may have been used at Willits. Billy and Betty Wann paid $12.50 in 1964 to rent an auger to dig holes for a fence (machine hire). Petitioners claimed an investment credit of $250.28 for 1963 and $22.02 for 1964 on undescribed new and used property acquired during the respective years, at respective costs of $3,575.40 and $314.50. In his statutory notice of deficiency the respondent determined that the investment credits claimed for 1963 and 1964 were not allowable because of petitioners' failure to substantiate *66 their entitlement to such credits. He also disallowed the farm losses claimed for 1962, 1963 and 1964 for failure of petitioners to substantiate the farm expenses claimed and because petitioners failed to establish that the losses resulted from transactions entered into for profit or were incurred in a trade or business. Since adjusted gross income as determined exceeded $10,000 in each year, the standard deduction was allowed in lieu of the lesser itemized deductions claimed. For 1962 respondent also disallowed the dependency exemption claimed for Billy's mother, Loda Dawson, for failure of petitioners to establish that they provided more than one-half the total cost of her support for that year. In their 1962 return Loda was claimed by petitioners as a dependent whose support was furnished 51 percent by petitioners with $720 reported as the amount of support furnished by others. The petition filed herein does not assign error to respondent's denial of the claimed investment credits or to his determination that for 1962 petitioners are not entitled to a dependency exemption for Loda Dawson. However, at trial and on brief the parties have tried and argued the case as if those issues *67 were involved and present for decision. Opinion The primary question presented for our decision is whether or not the petitioners' farming activities constituted a trade or business or, alternatively, a venture entered into for the production of income. If this question is answered in the affirmative, we must then decide whether certain expenses and losses therefrom are deductible under sections 162(a), 212, and 165(a) and (c)(1) and (2) of the 1954 Internal Revenue Code. [1] *68 *69 The petitioners' claim to investment credits for the taxable years 1963 and 1964 is also dependent upon the determination of the 1306 initial question. In the absence of a trade or business or production of income status, a depreciation deduction would not be allowable with respect to the petitioners' purchased property, sec. 167(a), [2] and they would, therefore, not be entitled to an investment credit. Secs. 38 and 48(a)(1). [3] *70 A secondary issue for decision is whether the petitioners are entitled to claim Loda Dawson, Billy Wann's mother, as a dependent for the taxable year 1962. The question of whether the petitioners' farming or cattle raising activities constituted either a trade or business or a venture for the production of income turns, to a significant extent, upon the factual determination of the petitioners' intent, or lack thereof, to realize a profit from their livestock raising endeavors. Margit Sigray Bessenyey v. Commissioner, 45 T.C. 261, 273 (1965), affd. 379 F. 2d 252 (C.A. 2, 1967). The realization of this profit need *71 not be immediate, although the prospects of eventual profit have a strong bearing on the taxpayer's maintenance of the requisite good faith intent to make a profit. Hirsch v. Commissioner, 315 F. 2d 731, 736 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court. Our determination of the intent question, which is one of fact, must be made upon the entire record before us in light of the fact that the petitioners have testified positively and contended ardently that they rented the farm and entered the cattle business to make a profit and that the expenses claimed for the years in question were ordinary and necessary to their farming "business." Most of the expenses claimed by the petitioners, such as mileage and salaries, even if deductible as business expenses, are of the recurring type and, therefore, if a profit was ever to be realized by petitioners the income from their livestock sales would have to be substantially increased to exceed these expenses. This, of course, would necessitate a substantial increase in operations by the petitioners, and upon the record presented it is obvious that the petitioners were in no position and did not intend to increase their farming *72 operations substantially. This is evidence that they therefore lacked the requisite intent to realize a profit even eventually. Petitioners contend that their livestock "enterprise" during the taxable years in question had not as yet been developed to the extent that a profit could be realized. Petitioners call the Court's attention to our country's bountiful history of little businesses growing into giants. On the record before us, however, we cannot see the slightest promise that the petitioners' farming activities might grow to the level of a small profitable business, let alone a giant. An examination of all the relevant facts and circumstances revealed by the record can 1307 only lead to the conclusion that the petitioners did not intend to realize a profit from their cattle operation but used it to the greatest extent possible only for the purpose of creating what they hoped and expected would be a tax benefit. We are dealing with 25 acres of land with a small barn and a moderately sized residence upon it. The $600 annual rent for the entire premises which petitioners deducted in toto as a farm expense, hardly attests to the value of this property as farmland from which a profitable *73 cattle operation could be run. Approximately half of the property, 12 1/2 acres at most, is used as pasture land. This was steep and hilly and on this portion of the "ranch" all of the buildings were located. The other half had alfalfa growing on it, and while it appeared to be good bottom land along the Russian River, the evidence before us does not demonstrate that it would support much of a cattle ranch operation. We are convinced that upon the entire record presented petitioners, too, did not have a bona fide profit purpose in the operation of their "farm." A profitable cattle raising venture would entail a substantially increased number of cattle and it is not likely that less than 12 1/2 acres of very hilly pasture land and an approximately equal size alfalfa field would afford the necessary "spread" for such an operation. Neither of the petitioners has had any training for or experience in farming or cattle raising activities. With the petitioners' working long hours at full-time jobs and their young children in regular school attendance during the years, the farming enterprise in 1962, 1963 and 1964 received a minimal amount of attention. Except for some occasional peripheral *74 farming duties and supervision of petitioners' young sons, Loda Dawson spent most of her time as the housekeeper and "baby sitter" for petitioners. We must observe that petitioners, while hardworking and industrious, were somewhat lackadaisical in their efforts to make their farm operation profitable. They obviously had little time or strength to be otherwise. Petitioners put in a long day at work away from their home; Billy left home at or before dawn and generally returned in mid or late afternoon or after dark, and Betty started going before 6 a.m. and often did not get back home until late afternoon. Their oldest sons were only 10 and 9 in 1962, and while apparently helpful at home and around the farm, the children could not be counted on to run a successful cattle operation in the years before us. Neither the sales ($214.95 in 1962, $586.10 in 1963, $258.60 in 1964) nor purchases (none in 1962, $812 in 1963, $195 in 1964) over the years in question show that petitioners were seeking to increase the volume of their cattle operations. If anything, there was a downtrend in the petitioners' farming activities. This downtrend did level off, however, for by 1967, the petitioners had *75 no cattle at all on their farm. In fact the only thing that seemed to increase over the years were the claimed farm losses. Billy indicated in his testimony at trial that he stopped his cattle operation when the Internal Revenue Service began to question his losses. We are persuaded that the motive for the operation was anticipated tax savings and benefits rather than expected profits. This conclusion is fortified by the piling on of alleged farm expense items claimed to increase those losses over the years. The young boys were put on the payroll of the farm at $598 per year each at ages 10 and 11 and that amount was deducted as farm expense even though it was arbitrarily selected as a figure out of thin air to keep each boy's income less than $600. There is no evidence that it was in fact ever paid or that any amount even approaching that sum was given to the boys. While the evidence might justify the conclusion that Billy's mother, Loda Dawson, was paid $1,300 a year as claimed for 1963 and 1964, it is obvious she was paid for her personal services in petitioners' household, if at all, and not for any farm labor or duties attached to cattle raising. Yet petitioners deducted her entire *76 yearly pay as farm salary. They likewise deducted all of their automobile and truck expenses as farm expense even though almost the entire use for the vehicles was clearly for commuting between petitioners' home and their employment and thus personal in nature rather than for farm purposes. We conclude that petitioners moved to the farm for personal reasons and that any and all of their alleged cattle ranching activities in the years before us were personally motivated and inspired; their cattle operation was not operated for profit or with any bona fide expectation or hope of deriving a profit therefrom. We conclude that petitioners' activities did not constitute a trade or business or a venture entered into for the production of income and that the losses and expenses in 1308 question are not deductible in the years before us. In that the pick-up truck, tractor, and water pump were not used in a trade or business, or for the production of income, and are therefore not depreciable under section 167(a), the petitioners are not entitled to claim investment credits for the purchase of these assets. Secs. 38 and 48(a). The respondent's determination denying the claimed farm expenses to *77 the extent that they exceeded farm income for each year and the claimed investment credits for 1963 and 1964, must be sustained. Petitioners and respondent are not in agreement as to whether Loda Dawson can be claimed as a dependent for the taxable year 1962. Section 152(a) includes in its definition of "dependent" the father or mother of taxpayer, or an ancestor of either, over half of whose support was received from the taxpayer. The burden is on the petitioners to prove not only their own expenditures in support of Loda Dawson, but also that the amount they contributed exceeded one-half of the total support provided. Aaron F. Vance, 36 T.C. 547 (1961); Bernard C. Rivers, 33 T.C. 935 (1960). Although petitioners need not conclusively prove the exact or precise total cost of Loda Dawson's support, they must provide us with convincing evidence that the amount they provided exceeded one-half of that support. James E. Stafford, 46 T.C. 515 (1966). Petitioners have not made the slightest effort to provide us with any evidence to establish the total amount of support or the amount they contributed toward Loda Dawson's support in 1962. Having completely failed to carry their burden, it *78 is, accordingly, our holding that respondent's determination that petitioners have failed to establish that they provided more than one-half of Loda Dawson's support for the taxable year 1962, must also be sustained. Decision will be entered under Rule 50. Footnotes
1. An apparent mathematical error of $100 in total expenses is not explained in the record.↩
1. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; (2) traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business; and (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. * * * SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year - (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income; or (3) in connection with the determination, collection, or refund of any tax. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss (sustained during the taxable year) and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business, and * * * [All Code references herein are to the Internal Revenue Code of 1954.] ↩
2. SEC. 167. DEPRECIATION. (a) General Rule. - There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, or (2) of property held for the production of income. ↩
3. SEC. 38. INVESTMENT IN CERTAIN DEPRECIABLE PROPERTY. (a) General Rule. - There shall be allowed, as a credit against the tax imposed by this chapter, the amount determined under subpart B of this part. (b) Regulations. - The Secretary or his delegate shall prescribe such regulations as may be necessary to carry out the purposes of this section and subpart B. SEC. 48. DEFINITIONS: SPECIAL RULES. (a) Section 38 Property. - (1) In General. - Except as provided in this subsection, the term "section 38 property" means - (A) tangible personal propery, or (B) other tangible property (not including a building and its structural components) but only if such property - (i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or (ii) constitutes a research or storage facility used in connection with any of the activities referred to in clause (i), or * * * Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 4 years or more.↩